UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Rhiannon Nugent and Juan Quintana,
as Co-Personal Representatives of the
Estate of Juan A. Quintana II, deceased,

        Plaintiff,              Case No. 21-12741

vs.                      Hon. Jonathan J.C. Grey

Spectrum Juvenile Justice Services
and Spectrum Human Services, Inc.,

        Defendants.

_____/

**OMNIBUS OPINION AND ORDER**

## I. INTRODUCTION

This case involves the tragic death by suicide of a child, Juan
Quintana II ("Juan") on September 11, 2018. Juan's parents, Plaintiffs
Rhiannon Nugent and Juan Quintana, Co-Personal Representatives of
the Estate of Juan A. Quintana II, bring this 42 U.S.C. § 1983 action
alleging deprivations of Juan's Eighth and Fourteenth Amendment
rights. Defendants Spectrum Juvenile Justice Services and Spectrum
Human Services, Inc., ran the child welfare and residential treatment
facility in Highland Park, Michigan where a court detained Juan. The

parties filed several pending motions:

> A. Defendants Spectrum Juvenile Justice Services' ("SJJS") and Spectrum Human Services, Inc.'s ("SHS") motion for summary judgment. (ECF No. 100.) This motion is denied in part and granted in part.

> B. Defendants' motion to strike affidavits of Daniel Johnson and Xyler Wiseman. (ECF No. 118.) This motion is denied.

> C. Defendants' motion for leave to file supplement to motion for summary judgment. (ECF No. 127.) This motion is granted.

> D. Plaintiffs' ex parte motion for leave to file supplemental authority. (ECF No. 133.) This motion is granted.

> E. Defendants' motion to quash plaintiffs' invalid subpoena to Financial One and request for sanctions. (ECF No. 135.) This motion is granted.

> F. Plaintiffs' motion to compel the deposition of Stephanie Hayes. (ECF No. 136.) This motion is denied.

> G. Defendants' motion requesting status conference. (ECF No. 140.) This motion is denied as moot.

The motions have been fully briefed. The Court finds that the parties have adequately briefed the motions and, therefore, considers them without oral argument as it would not further aid the Court. E.D. Mich. LR 7.1(f).

## II.   BACKGROUND

SHS is the parent company of SJJS, which operates the Calumet

2

Center, a child welfare and residential treatment facility in Highland Park, Michigan. SJJS contracts with and is licensed by the State to provide "Residential Foster Care Juvenile Justice." (ECF No. 1, PageID.149.) Youth at the Calumet Center are adjudicated and placed by the State and have generally experienced "complex trauma." (ECF No. 100-42, PageID.3659–3660.) Individuals are placed in units with 9 to 11 others, and each unit has a therapeutic clinician and treatment team. *Id.* at PageID.3683.). Adjudicating judges are the only individuals with direct control over the length of a resident's stay, although SJJS clinicians provide status reports and recommendations to assist judges in exercising their discretion. (*Id.* at PageID.3682–3683.)

In early 2017, Juan, then 14 years old, was arrested after being found in possession of marijuana. (ECF No. 100-3.) The Huron County, Michigan Circuit Court-Family Division commenced juvenile delinquency proceedings, and released Juan on probation to the custody of his mother, plaintiff Rhiannon Nugent and his stepfather, David Nugent. (ECF No. 100-4.) At an October 25, 2017 probation violation hearing, Juan testified he smoked marijuana so he would be removed from their home. (ECF No. 100-9, PageID.3081.) The court first ordered

3

the Michigan Department of Health and Human Services ("MDHHS") to find an out-of-home placement for Juan (ECF No. 100-10) but subsequently permitted Juan to return to the custody of his mother. (ECF No. 100-12.)

After subsequent difficulties at his mother's home, the court released Juan to his maternal grandparents before placing him at Starr Albion Prep. (ECF No. 100-15, PageID.3118; ECF No. 100-16; ECF No. 100-17, PageID.3124.) When Juan made two attempts to flee Starr Albion Prep, he violated his probation, and on August 9, 2018, the court ordered that Juan be "return[ed] to detention," "is continued committed to the" MDHHS, and "shall remain in the DETENTION PENDING OUT OF HOME PLACEMENT." (ECF No. 100-18; ECF No. 100-19; ECF No. 100-20 (emphasis in original).) The court specifically ordered that Juan, by then 15 years old, be placed in a "secured placement" at the Calumet Center. (ECF No. 117-5, PageID.5582, 5585–5586.) Juan was admitted to the Calumet Center on August 9, 2018. (ECF No. 100-2.) His intake paperwork describes him as a "46-State Ward-Delinquent-Act 150." (ECF No. 100-21, PageID.3142.)

During Juan's intake on August 9, 2018, he denied any history of

attempted suicide, and he did not make any suicidal statements. (ECF No. 100-21, PageID.3140.) He also attested: "I will promptly report to staff any thoughts or feelings of self-harm I may have while I am housed at this facility. Should I have any suicidal thoughts, I will let staff know immediately so that I may receive help." (*Id.* at PageID.3141.) No cuts or scars were noted on Juan's legs during intake, and Juan denied that he had ever engaged in any form of self-harm (*Id.* at PageID.3140).

During Juan's psychiatric evaluation on August 18, 2018, the physician noted "[n]o homicidal or suicidal ideation." (ECF No. 100-22, PageID.3146–3147.) The evaluation report indicates Juan's history of anxiety, a substance use disorder (primarily marijuana), claustrophobia, panic attacks, and that he was on (or placed on) psychiatric medications including Seroquel and Zoloft. (ECF No. 100-22, PageID.3146-3147.)

Juan was required to keep a daily journal that was reviewed by supervisors and staff, although there is evidence that supervisors did not read the journals. (ECF No. 117-6, PageID.5597–5598.) According to SJJS policy, if a resident wrote about suicide in their journal, the staff had to report the statements to a therapist. (*Id.* at PageID.5597.) It is undisputed that Juan's writings included optimistic or happy themes,

including stating on the day of his death that he had "a good day. I'm excited to see my grandparents Thursday." (ECF No. 100-27, PageID.3278-3279, 3312.) However, Juan's journals also included the following entries:

- 8/27/2018 – Juan writes that he can't sleep and "my anxiety has been horrible every night for the last two weeks. I need to get some sleep. I can't handle not falling asleep and having anxiety til 12/1 am every night. It's driving me insane."

- 8/30/2018 – "I feel mad!"

- 9/2/2018 – "My anxiety has just been so shitty . . . I don't want to be around anyone! . . . I constantly feel like just breaking down, crying, giving up."

- 9/3/2018 – "My depression is really bad . . . My anxiety is also really bad. When my anxiety is bad, I feel even more like crap. My head is killing me. I'm just not doing good."

- 9/6/2018 – "Today was a shitty day . . . My meds already make me on edge . . . I have not been sleeping good at all, my anxiety has been bad. Shits just not good! And that's all I can think. My head isn't in the right place . . . I just feel like shit."

- 9/7/2018 – "I'm just in a shitty mood. I don't really know what to do anymore . . . I need help because I literally feel like I can't do this. I feel depressed as fuck!"

- 9/8/2018 – "I feel like shit."

- 9/10/2018 – "Anxiety is bad like it is 'every night.'"

(*Id.* at PageID.3295, 3299, 3303, 3304, 3306–3307, 3308, 3310.)

Terry Douglas, another juvenile detainee, reported to Darius Howard, a youth counselor at SJJS, at some unspecified time during Juan's one-month detention at the Calumet Center, that Juan said he was going to kill himself. . (ECF No. 117-9, PageID.5675 at 36.) However, Douglas also testified that Juan threatened to do so "[d]amn near every day." (*Id.*) Howard responded that Juan "needed to stop saying stuff like that" and "[i]f he keep saying it, I be putting him in a turtle suit." (*Id.* at 38.) In the weeks before Juan's death, he was found by SJJS staff stacking chairs on his desk in his room;[1] SJJS staff took down the chairs. (ECF No. 117-8, PageID.5657–5658.) SJJS juvenile detainee Xyler Wiseman attested that, on September 7, 2018, he and Juan authored a note containing a suicide pact between the two; the note identified a date and time for which it was to occur. (ECF No. 117-10, PageID.5686 at ¶3.) Wiseman further attested that an SJJS employee confiscated the note, no one at SJJS offered or provided Wiseman with any mental health or medical intervention, and Wiseman was not aware that any SJJS

---

[1] The parties' briefs and the deposition testimony of SJJS staff and juvenile detainees used both "cell" and "room" to describe the physical space in which each juvenile detainee was housed. For purposes of this Order, the Court will use the term "room." (*See, e.g.*, ECF No. 100-29, PageID.3360 ("Well, for the juveniles, we just call it their room. . . . It's a cell, but for the juveniles, we would just – it's, you know, step into your room. We never told them that it was a cell.").)

employee offered Juan any mental health or medical treatment as a result of the note. (*Id.* at ¶¶4–6.)

SJJS juvenile detainee Daniel Johnson attested that, during a basketball game on September 11, 2018, the day Juan died by suicide, Juan stated, "I want to hang myself from the basketball hoop at the end of the game," which Johnson reported to Vaness Thompson, a youth worker at SJJS. (ECF No. 117-14, PageID.5753 at ¶¶4, 5.) According to Douglas, also on September 11, 2018, on Pod 6 on the lawn on their way to church, in front of Thompson, Howard, and approximately 10 juvenile detainees, Juan threatened to kill himself. (ECF No. 100-32, PageID.3480–3482.) Douglas relayed further that in response, Thompson said, "Stop saying that dumb shit," made Juan sit down, and told Juan that he could not go to church. (*Id.* at PageID.3482, 3503–3504.)

On September 11, 2018, Juan was in his room preparing for bed when Thompson checked on him at approximately 7:57 p.m. (ECF No. 100-25, PageID.3211 at 44.) Thompson testified that she asked Juan if he was okay, Juan responded in the affirmative (*id.*), and nothing about Juan's room looked out of the ordinary. (*Id.* at PageID.3222 at 88, PageID.3224 at 96–97.) Approximately 45 minutes later, after neither

8

herself nor any other SJJS staff had conducted a 15-minute check on Juan, as required by SJJS policy, Thompson found Juan in his room hanging from a bed sheet that had been looped through an air conditioning vent. (*Id.* at PageID.3208 at 32–33, PageID.3211 at 44–45, PageID.3213 at 52–53).

That same night, at approximately 7:56 p.m., another SJJS juvenile detainee, Dakota Hayward placed "pink sheets" outside residents' doors at approximately 7:56 p.m. on September 11, 2018; these observational or "pink" sheets are for staff to indicate when they perform the required 15-minute eye-on checks of the juvenile detainees. (ECF No. 100-34, PageID.3533 at 43–44). Hayward testified that SJJS staff filled out the observation sheets ahead of time. (*Id.* at PageID.3534 at 48.) Hayward observed Juan inside his room sitting at his desk and then standing on top of his bed, which Juan said was because he was "trying to stretch his back out." (*Id.* at PageID.3533 at 44.) Hayward testified that Juan's bed was a mess, all the sheets were taken off the bed and were sitting on the floor, and the only thing on the bed was a blue blanket. (*Id.* at PageID.3533–3534 at 44, 47.)

Another SJJS juvenile detainee, Titus Kida, testified that he

9

witnessed Thompson check on Juan while Juan was in his room, and that sometime afterwards, Juan asked Kida to tell staff to turn off Juan's light so that Juan could go to sleep (ECF No. 100-33, PageID.3516 at 17–18, PageID.3519–3520 at 28-30, 32–35). Kida approached Juan's door and indicated, "Yeah, I got you bro," and then gave Juan a fist bump through the glass and told Thompson to turn the light off. (*Id.* at PageID.3519 at 29–30). Douglas provided substantially similar testimony (ECF No. 100-32, PageID.3498–3500). In fact, Douglas testified that Juan knocked on his window and stated "[t]ell Ms. Thompson to turn my light off," that Douglas then did so, and that "five or seven" minutes later Thompson discovered Juan's lifeless body hanging by his neck from his room's vent by his sheet fashioned into a ligature. (*Id.* at PageID.3499; ECF No. 117-12; ECF No. 117-13; ECF No. 117-15). According to Johnson, when Thompson found Juan hanging in his room, she screamed, "He fucking told me!" with respect to Juan's threats earlier that day that he was going to kill himself. (ECF No. 117-14, PageID.5754 at ¶ 8.)

At the time of his death, Juan had two visible "healing" cuts/scars on the front of his right thigh, each of which was greater than 1½" x 1½." (ECF No. 145-1, PageID.7643–7644.)

10

On November 6, 2020, plaintiffs filed a negligence action against defendants in the Wayne County Circuit Court. On November 24, 2021, plaintiffs filed the instant case against defendants in this Court, alleging that defendants were deliberately indifferent to Juan's serious medical need, i.e., suicidal ideation.

## III. LEGAL STANDARD

The Rules of Civil Procedure provide that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."

11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–324 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–323. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## IV.   ANALYSIS

### A.   Defendants' Motion to Strike

Defendants move to strike Wiseman's and Johnson's affidavits (ECF Nos. 117-10, 117-14, respectively) and to preclude Wiseman and Johnson from testifying at any trial. (ECF No. 118.) Defendants accurately assert that neither Wiseman nor Johnson was listed on plaintiffs' initial disclosures or witness list filed in November 2023, even though four other juvenile detainees who resided at the Calumet Center

when Juan was there were listed on those documents. Defendants took the depositions of those four listed detainees prior to the close of fact discovery on July 9, 2024.

As defendants state, plaintiffs were notified no later than December 2021, i.e., almost two years before plaintiffs filed their initial witness list, that Wiseman and Johnson were Calumet Center detainees at the time of Juan's death. In December 2021, in response to a December 2, 2021 court order in the state court negligence action, the MDHHS identified Johnson and Wiseman as "residents" in conjunction with its investigation into Juan's death. (*See* ECF No. 120-5, PageID.6296.)

On September 6, 2024, plaintiffs filed: (a) a First Amended Lay Witness List in this case identifying Wiseman and Johnson as witnesses (ECF No. 97, PageID.2955); and (b) Supplemental Initial Disclosures that stated Wiseman and Johson would testify "regarding the allegations contained in this lawsuit." (ECF No. 118-3, PageID.6098 at ¶¶ w., x.) Johnson's affidavit is dated, and was provided to defendants, on September 20, 2024. Wiseman's affidavit was signed on October 28, 2024, and it was first made known to defendants on October 31, 2025.

Defendants argue that plaintiffs violated the Federal Rules of Civil

Procedure (namely, Rule 26) when they withheld this information until after fact discovery had closed, yet plaintiffs still seek to rely on the affidavits in opposition to defendants' summary judgment motion. Defendants assert that the Court should strike Wiseman's and Johnson's affidavits pursuant to Rule 37 and preclude them from testifying at trial. Rule 37 (c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use the information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

As defendants state, a court is to consider the following when deciding whether to allow late evidence:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

*Redmond v. United States*, 194 F. Supp. 3d 606, 613 (citing *Howe v. City of Akron*, 801 F.3d. 718, 747–748 (6th. Cir. (2015)).

The Court finds that the fifth element weighs in defendants' favor. The Court agrees with defendants that there is no "substantial justification" for failing to disclose this information, as required by Rule

26(a) and (e). Plaintiffs knew or should have known about Johnson and Wiseman long before September 2024—approximately two years before they filed their initial witness list in November 2023. There is no justification for plaintiffs' failure to timely produce Johnson's and Wiseman's affidavits because this federal case had been litigated for: (a) over 33 months before plaintiffs disclosed Wiseman and Johnson as possible witnesses (despite naming other detainees at the Calumet Center during the time Juan was there); (b) over 33 months before they produced Johnson's affidavit to defendants; and (c) over 35 months before they provided Wiseman's affidavit to defendants. Further, plaintiffs began litigating the events surrounding Juan's death in a negligence action filed on November 6, 2020, i.e., just shy of **four years** before they identified Johnson and Wiseman as possible witnesses. Finally, neither affidavit was provided to defendants prior to the dispositive motion cut-off, when defendants timely filed their summary judgment motion. In short, plaintiffs' failure to identify and obtain affidavits from Johnson and Wiseman (or notice them for deposition) prior to September 2024 is inexplicable and anything but justifiable.

The Court also finds that the evidence at issue is important. Both

Johnson's and Wiseman's attestations, as discussed in this Order, appear to be highly probative of a factfinder's understanding of the events in the Calumet Center at or near the time of Juan's death.

Nonetheless, the Court is not persuaded that it should strike Johnson's and Wiseman's affidavits or preclude their testimony. The other three elements do not weigh in defendants' favor, and, more importantly, the Court finds that plaintiffs' failure to previously identify Johson or Wiseman as witnesses or produce their affidavits is harmless. This is true, even where plaintiffs named 375 former employees of defendants on their witness list, failed to provide responses to defendants' second interrogatories, and fought narrowing down their witness list until August or September 2024.

Most significant to the Court's decision is the fact that there is no reason for defendants' expressed surprise about the existence of Johnson and Wiseman or their attestations. Like plaintiffs, defendants have known about Johnson and Wiseman since at least December 2021, and defendants had the opportunity to investigate what Johnson and Wiseman knew vis-a-vis Juan's death. Moreover, it seems elementary and obvious that the most critical persons to talk to, conduct discovery

16

about, and depose in this action would be those persons who interacted with Juan during his thirty-three days at the Calumet Center, i.e., the SJJS staff and juvenile detainees from August 9, 2018 to September 11, 2018, especially as the parties had a list of such persons from MDHHS.

As defendants have known about Johnson and Wiseman since December 2021 (nearly three years before the summary judgment motion was filed), there is no surprise that needs to be cured. In addition, due to plaintiffs' tardy disclosure of Johnson and Wiseman as witnesses and their affidavits, and in the interests of justice, if defendants wish to depose Johnson and/or Wiseman, they may do so **on or before December 12, 2025, provided defendants notice Johnson and/or Wiseman for deposition on or before November 21, 2025**. Finally, as defendants will have had the affidavits for over a year before trial, and because the Court is allowing defendants to depose Johnson and Wiseman about a month before the current scheduled trial date, the Court finds that trial will not be disrupted.[2]

---

[2] The Court also finds that, based on the attestations in Johnson's and Wiseman's affidavits, their testimony on many events would be probative of the events surrounding Juan's death. Further, even if defendants draw out testimony in Johnson's and Wiseman's depositions that contradicts the attestations in their affidavits, the statements in the affidavits would simply create a genuine dispute of material fact regarding their statements. In other words, in a light most favorable to

17

For the reasons stated above, the Court **DENIES** defendants'
motion to strike affidavits of Johson and Wiseman. (ECF No. 118.) The
Court finds, however, that defendant's motion was reasonably filed based
on plaintiffs' untimely disclosure of the names and affidavits of Johnson
and Wiseman, in violation of Rule 26. The Court further finds that
plaintiffs' untimeliness is sanctionable, such that defendants are entitled
to reasonable costs associated with filing the motion to strike affidavits.
Therefore, the Court **ORDERS** that **<u>plaintiffs shall pay defendants
$2,000 as sanctions</u>** for plaintiffs' unjustified failure to timely disclose
the names and affidavits of Johnson and Wiseman.

### B. Defendants' Motion for Summary Judgment

#### 1. State Action

Defendants argue that they were not acting under color of state law,
so there can be no viable § 1983 action against them. *Gray v. City of
Detroit*, 399 F.3d 612, 615 (6th Cir. 2005). They claim that plaintiffs
cannot satisfy any of the three tests that establish that a person is acting
under color of state law: (1) the public function test; (2) the state

---

plaintiffs, it would be up to the jury to decide how credible they are and what weight
their testimony should be given.

compulsion test; or (3) the symbiotic relationship or nexus test. *Chapman v. Higbee Co.*, 319 F.3d 825 (6th Cir 2003), *cert. denied*, 542 U.S. 945 (2004). Defendants acknowledge that the Sixth Circuit has already held that plaintiffs plausibly **<u>alleged</u>** that SJJS was serving a "traditionally exclusive state function" related to Juan's placement because a court had ordered Juan to be detained at SJJS, a correctional facility, based on his probation violations. (ECF No. 100, PageID.3026 (citing *Nugent v. Spectrum Juv. Jus. Servs.*, 72 F.4th 135, 143 (6th Cir. 2023)).)

As the Sixth Circuit stated when this case was appealed, "Under our precedent, detention centers are generally considered 'a public function traditionally reserved to the state.'" *Nugent*, 72 F.4th at 41 (quoting *Skelton v. Pri-Color, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991) (per curiam) (finding state action where a private corporation maintained a pretrial detention facility)). The Sixth Circuit also distinguished the cases upon which defendants rely, including *Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750 (6th Cir. 2020), where defendant was a private entity designed to "facilitate youth's involvement in the community." *Nugent*, 72 F.4th at 142–143.

Defendants argue, however, that the **<u>evidence</u>** does not support

plaintiff's allegations that they are state actors because "SJJS's care and treatment of Juan was anything but a traditional or exclusive state function." (ECF No. 100, PageID.3026.) Defendants contend that Juan initially was ordered to an out-of-home placement because of his parents' conduct, the need for shelter residential care, and mental health and behavior stabilization services. (*Id.* at PageID.3026–3027 (citing ECF No. 100-9, PageID.3083–3084 and quoting the juvenile court judge as saying, "I'm gonna treat this almost like it was a neglect case.").) Defendants suggest that Juan was subjected to "residential foster care" intended to facilitate his "continuing engagement in the community," which is not a traditional state function, because he was removed from the home for neglect. (*Id.* at PageID.3027–3028 (including n.7) (citing *Nugent*, 72 F.4th at 142–143; and *Howell*, 976 F.3d at 753, 754).) The Court rejects defendants' wholly unsupported contention.

Juan's path to court-ordered detention at the Calumet Center began when he was arrested for possession of marijuana. After the Huron County Circuit Court-Family Division authorized juvenile delinquency proceedings, Juan was released on probation. Juan violated that probation, as evidenced by his admission at an October 25, 2017

probation violation hearing that he smoked marijuana. Although that court first ordered MDHHS to find an out-of-home placement for Juan, then permitted him to return to the custody of his mother, the court subsequently placed him at Starr Albion Prep. Later, when Juan made two attempts to flee Starr Albion Prep, that court determined that Juan violated his probation, and on August 9, 2018, ordered that Juan be "return[ed] to detention," "is continued committed to the" MDHHS, and "shall remain in the DETENTION PENDING OUT OF HOME PLACEMENT." (ECF No. 100-18; ECF No. 100-19; ECF No. 100-20 (emphasis in original).) That court also specifically ordered that Juan be placed in a "secured placement" at the Calumet Center. (ECF No. 117-5, PageID.5582, 5585–5586.)

The Court also finds that the evidence proffered satisfies the numerous factors the Sixth Circuit cited as necessary to establish that a facility is a state actor. Those factors include that: (a) the facility is similar to a prison setting; (b) the State has endowed the facility "with legal authority to exercise control over the juveniles under court-ordered confinement;" and (c) the youth could only obtain release through court order. *Nugent*, 72 F.4th at 143.

21

Here, undisputed facts exist that: (1) Juan was placed at SJJS pursuant to a court order (*see* ECF No. 117-5, PageID.5585–5586); (2) the Calumet Center was similar to a prison setting because it was a secured detention facility where Juan (and other juvenile detainees) were subject to 24 hours/7 days a week supervision; and (3) the juvenile detainees' movements were restricted as though they were prisoners. (*See, e.g.*, ECF No. 117-3, PageID.5513–5515; ECF No. 117-4, PageID.5559 at 41–42; ECF No. 117-9, PageID.5669 at 16.) Those conditions were evident on the day of Juan's death. He was not permitted to attend church, was required to don an orange jumpsuit, had his movement restricted to areas and activities approved by SJJS staff, and was forced to return to his room for the night. (*See, e.g.*, ECF No. 117-4, PageID.5557–5558 at 35–37.) The Court also notes the testimony of Maurice Dillard, a youth supervisor who worked for SJJS, including at the Calumet Center in 2018, who stated, "when it boils down to it, yeah, it's [the Calumet Center] like a jail-type facility." (ECF No. 117-21, PageID.5875 at 15.) Finally, there are locks on the doors on the outside of each juvenile detainee's room. (*See, e.g.,* ECF No. 117-29, PageID.6016–6017.)

Accordingly, the Court finds that plaintiffs have established that

Juan's detention at the Calumet Center satisfied the public function test and that SJJS is a state actor.

### 2.   *Deliberate Indifference*

For a deprivation of Eighth Amendment and Fourteenth Amendment rights under a § 1983 claim, a plaintiff must show that defendants were deliberately indifferent to an objectively manifested serious medical need. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (applying Eighth Amendment standard); *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 316 (6th Cir. 2023) (applying Fourteenth Amendment standard); *Loyer v Wayne Cnty.*, No. 21-12589, 2025 WL 889770, at *5 (E.D. Mich. Mar. 21, 2025) (applying the Fourteenth Amendment standard). "The Eighth Amendment prohibits the infliction of cruel and unusual punishment." *Perez v. Oakland Cnty.*, 466 F.3d 416, 423 (6th Cir. 2006), citing U.S. Const. Amend. VIII. As applied specifically within the context of suicide prevention and monitoring, the Eighth Amendment encompasses "a right to medical care for serious medical needs, including psychological needs." *Perez*, 466 F.3d at 423.

Under the Fourteenth Amendment, the standard for deliberate indifference is the same as the Eighth Amendment, with one exception:

23

the deliberate indifference standard, as applied to pretrial detainees, "lower[s] the subjective [knowledge] component from actual knowledge to recklessness." *Helphenstine*, 60 F.4th at 316. Thus, under the pretrial-detainee standard, a plaintiff must show "(1) that [the decedent] had a sufficiently serious medical need and (2) that each defendant acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 317 (cleaned up). *See also Greene v. Crawford Cnty.*, 22 F.4th 593, 607 (6th Cir. 2022); *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022).

"Inmates do not have an Eighth Amendment right 'to be screened correctly for suicidal tendencies,' but 'prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner.'" *Grabow v Macomb Cnty.*, 580 F. App'x 300, 307 (6th Cir. 2014) (quoting *Comstock v. McCrary*, 273 F.3d 693, 72 (6th Cir. 2001)).

When considering whether a state actor has violated its obligation to offer medical care to a prisoner with serious medical needs, a court must consider "whether the decedent showed a strong likelihood that he

24

would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifferent to the decedent's serious medical needs." *Gray*, 399 F.3d at 616 (quoting *Barber v. City of Salem*, 953 F.2d 232, 239–240 (6th Cir.1992)). Therefore, a plaintiff must show: (1) manifestation of a serious medical need in the form of specific indicia of suicide, and (2) deliberate indifference to that need. *Perez*, 466 F.3d at 423–424. The subjective component requires the plaintiff to show that the defendant "perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Bryant v. Hensley*, No. 23-5608, 2024 WL 1180440, at *2 (6th Cir. Mar. 19, 2024) (citing *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

### a.    Serious Medical Need

Defendants argue that not only did Juan deny any history of suicidal ideation, but his therapist, the physician who conducted Juan's psychiatric evaluation, SJJS staff and supervisors, the youth workers, fellow juvenile detainees, and his family did not witness any suicidal or self-harm ideation. (ECF No. 100, PageID.3014–3019 (citations omitted); ECF No. 120, PageID.6270–6273 (citations omitted).) Defendants' factual

analysis, however, fails to consider the aggregate evidence in a view most favorable to plaintiffs, the non-moving party, which is the applicable standard of review. *Anderson*, 477 U.S. at 248; *Matsushita*, 475 U.S. at 586.

The Court notes that there were numerous statements, acts, events, and circumstances involving Juan from which a reasonable factfinder could determine that, as of September 11, 2018, there was a manifestation of a serious medical need in the form of specific indicia of suicide by Juan. First, it is undisputed that while in his room in the weeks prior to his death Juan stacked chairs on his desk—and that SJJS staff was aware that he had done so because SJJS staff took the chairs down. (ECF No. 117-8, PageID.5657–5658.) Defendants have not offered a reason why Juan stacked the chairs on his desk, and a reasonable factfinder could conclude that Juan did so for the purpose of attempting suicide in the same manner by which he ultimately died weeks (or less) later, hanging from a high point in his room.

As the Sixth Circuit has stated,

> When considering the objective component in *Perez*, we remarked that "past threats or attempts at suicide are considered when determining whether an individual is suicidal" even though such past attempts do not necessarily

26

> mean the detainee will do so again. *Perez*, 466 F.3d at 425.
> There, we held that there was a question of fact regarding
> whether the decedent posed a strong likelihood of another
> suicide attempt, even where the decedent "gave no indication
> of suicidal intention during his final evaluation" and in fact
> denied any such suicidal intention. *Id.*
>
> Here, [plaintiff] meets the objective component insofar as her
> father "exhibited suicidal tendencies" during his detention.
> Charles first attempted suicide on November 14. Such an
> attempt itself exhibits suicidal tendencies sufficient to meet
> the objective component. *See, e.g., Collins v. Seeman*, 462 F.3d
> 757, 760 (7th Cir. 2006). Even though that past attempt did
> not necessarily demonstrate that Charles would re-attempt
> suicide, we have previously held that a prior attempt alone is
> sufficient to raise a dispute as to the objective component.
> *Perez*, 466 F.3d at 425.

*Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 484 (6th Cir. 2020). Charles, the decedent in *Troutman*, died on November 24, 10 days after his first attempt while in detention.

Second, upon seeing Juan hanging from the vent, Thompson exclaimed, "He fucking told me!" (ECF No. 117-14, PageID.5745 at ¶ 8.) This exclamation related to her awareness that Juan threatened suicide twice the day he died; when she personally heard Juan say he wanted to kill himself (ECF No. 100-32, PageID.3480–3482) and when Johnson reported to her that, while playing basketball, Juan stated that he "want[ed] to hang [him]self from the basketball hoop at the end of the

game." (ECF No. 117-14, PageID.573 at ¶¶ 4, 5.)

Third, Wiseman and Juan authored a note containing a suicide pact only four days before Juan's death; the note contained an identified date and time for which it was to occur and an SJJS employee confiscated the note. (ECF No. 117-10, PageID.5686 at ¶¶3–6.) Fourth, Douglas reported to Howard that Juan said he was going to kill himself (ECF No. 117-9, PageID.5675 at 36), and Howard also heard Juan say on September 11, 2018 that he was going to kill himself. (ECF No. 100-32, PageID.3480-3482.)

Fifth, Douglas testified that Juan made suicidal statements almost every day. (ECF No. 117-9, PageID.5675 at 36.) Although daily suicidal statements could be interpreted as mitigating the need to treat Juan's alleged suicidal statement on September 11, 2018 as credible (as defendants seem to suggest), the fact that Juan allegedly made suicidal statements nearly every day also could be considered evidence that defendants should have been on notice that Juan had a serious medical need, with specific indicia of suicide.

Sixth, cutting by a juvenile detainee may indicate that an objectively serious medical need exists. *See, e.g., Brewer v. R.M.S.I.*, No.

3:21-CV-00808, 2022 WL 212403, at *2 (M.D. Tenn. Jan. 24, 2022) (citing *Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018), *abrogated on other grounds by Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 591–597 (6th Cir. 2021)) ("it is plausible that the alleged 'severe' cuts on the plaintiff's wrists were objectively sufficiently serious."). It is undisputed that Juan, while detained at the Calumet Center, had been cutting on his right thigh. In a light most favorable to plaintiffs, the record evidences a genuine dispute of material fact whether SJJS staff members knew about the cutting. For example, the cuts were at least several days old, as they were healing, and Juan wore shorts while playing basketball while supervised, including on September 11, 2018. As such, a reasonable factfinder could determine that SJJS staff observed the cutting, which Juan did not have during his intake to the Calumet Center.

Seventh, some of Juan's journal entries, *see* page 6, *supra*, taken together with his diagnosed anxiety and prescription medication (Zoloft and Seroquel), could signal a person experiencing a mental health crises that could manifest itself in a "strong likelihood" of suicide if the suicide was "clearly foreseeable." *Gray*, 399 F.3d at 616.

Finally, as stated in *Wise v. Maier*, No. 5:21-cv-2203, 2023 WL

4706816, at *13 (N.D. Ohio July 24, 2023):

> The Sixth Circuit has identified several risk factors indicating a "strong likelihood" of suicide, including: (1) a history of alcohol and substance abuse, (2) feelings of hopelessness, (3) impulsive or aggressive tendencies, (4) isolation, (5) access to methods for suicide, (6) a history of mental illness, particularly clinical depression, and (7) prior traumatic brain injuries.

*Id.* (citing *Troutman*, 979 F.3d at 484).

Here, plaintiffs have submitted evidence of almost all of those considerations. As reflected in Juan's court proceedings, he had a history of substance abuse (primarily marijuana but also cocaine and Adderall). As set forth above, his journal entries reflect feelings of hopelessness, isolation, anxiety and depression, all of which may be indicative of suicidal ideation. In addition, there is testimony that Juan did not spend time with many other detainees, argued with others the day of his death, and as Hayward testified, was withdrawing (isolating himself) from others and was not himself in the hours before his death. (ECF No. 117-4, PageID.5557–5558 at 35–37.)

In a light most favorable to plaintiffs, Juan's statements, writings, actions, behavior, substance abuse history, anxiety and medications, taken together and as described above, could allow a reasonable trier of

fact to find a manifestation of a serious medical need, namely a specific indicia of suicide, particularly on September 11, 2018, i.e., there was a strong, even imminent, likelihood of suicide on that date. *See Galloway v. Anusakiewicz*, 518 F. App'x 300, 336 (6th Cir. 2013); *Craddock v. Macomb Cnty.*, 718 F. Supp. 3d 683, 699 (E.D. Mich. 2024).

### b.    Deliberate Indifference

#### i.    *Deliberate Indifference*

The Court next considers the subjective component and finds that plaintiffs have demonstrated deliberate indifference by defendants sufficient to overcome a motion for summary judgment. As discussed above, (a) Howard and Thompson were aware of Juan's suicidal statement made on September 11, 2018 on Pod 6; (b) Thompson was aware that earlier in the day Juan also stated the he wanted to hang himself from the basketball rim; (c) Howard was previously made aware that Juan threatened suicide and responded that Juan may need to be put in a "turtle suit" if he kept making suicidal statements; (d) SJJS staff were aware that Juan had cuts on his leg because in a light most favorable to plaintiffs, the cuts would have been visible at least during a basketball game earlier that day; (e) SJJS staff were aware that Juan

stacked chairs on the desk in his room at some point in the weeks before his death; and (f) SJJS staff knew about Juan's medical and mental health history, including anxiety, depression, and frequent threats of suicide, as observed by SJJS staff, set forth in Juan's journal entries, and as reported by Juan's podmates. Importantly, "[p]sychological distress may constitute a serious medical need, especially when it 'result[s] in suicidal tendencies.'" *Bryant*, 2024 WL 1180440, at *2 (quoting *Horn ex rel. Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994); and citing *Troutman*, 979 F.3d at 482–483.)

In addition, according to Thompson's notes, (i) SJJS staff was "dealing with self-harm and suicides on the daily;" (ii) she and her supervisor had gathered juvenile detainees and discussed suicide months before Juan's death because it was "getting out of hand;" (iii) she used to walk around with scissors in her pocket because "the residents will attempt to hang themselves on the daily;" (iv) she had to cut down several juvenile detainees from the ceiling vents in their rooms when she found them with t-shirts and blankets attached around their neck; and (v) she documented these suicide attempts and informed management. (*See* ECF No. 117-16.).

32

There is evidence that SJJS staff did not take measures to ensure Juan's safety—most critically, by failing to even conduct 15-minute checks on Juan, as required by Michigan Administrative Code Rule 400.4127(4) ("When residents are asleep or otherwise outside of the direct supervision of staff, staff shall perform variable interval, eye-on checks of residents. The time between the variable interval checks shall not exceed fifteen minutes."). The failure to conduct the 15-minute checks on Juan could reasonably be viewed as particularly egregious after SJJS staff restricted his activity on September 11, 2018 and were aware of all of the above statements, writings, actions, behavior, substance abuse history, anxiety, and medications.

Similarly, defendants had knowledge that numerous residents looped t-shirts and/or bed sheets through the vents in their rooms in an attempt to kill themselves, they were on notice that the vents in the rooms at the Calumet Center were dangerous. More importantly, a reasonable factfinder could determine that defendants were aware that the Mental Health Environment of Care Checklist General Criteria, criteria that SJJS's Executive Director, Melissa Fernandez, possessed, were required in the rooms, and that different vents should have been

installed in advance of September 11, 2018. (ECF No. 117-17, PageID.5786.) As that checklist states: "vents or registers must be designed so that they cannot be used as anchor points for hanging." (*Id.*) The vents in Juan's room violated this industry standard.

"Considering the totality of the circumstances, a jury could conclude that these defendants acted deliberately and recklessly in the face of an unjustifiably high risk that [Juan] would attempt suicide." *Bryant v. Hensley*, No. CV 0:22-018-DCR, 2023 WL 3743571, at *8 (E.D. Ky. May 31, 2023), *aff'd,* No. 23-5608, 2024 WL 1180440 (6th Cir. Mar. 19, 2024). *See also Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016) (subjective element satisfied when plaintiffs "point[ed] to evidence that [defendant] knew about [decedent pretrial detainee]'s recent suicide attempt and his history of depression; that she was told by Randi that Hyatt was suicidal; and that [defendant] did not issue him certain items 'due to his history of depression and suicide attempts.'"); *Shepard v. Hansford Cnty.*, 110 F.Supp.3d 696, 710 (N.D. Tex. 2015) (citations omitted) (subjective element satisfied when there was evidence defendant left the detainee "in a cell with access to a towel, blanket, and shower curtain—dangerous objects that could easily be used by an inmate to commit suicide," and

defendant "intentionally abandoned her observation post on multiple occasions, failed to maintain the required fifteen-minute face-to-face observations, and made no efforts to ensure that the suicide watch was maintained in her absence.")

### ii.    Official Policy, Custom, or Practice

Defendants argue that, because plaintiffs have elected to sue SJJS and SHS, rather than any particular employee, for Juan's death, plaintiffs must establish an "official policy, custom, or practice . . . as the source of the constitutional violation." (ECF No. 100, PageID.3042 (quoting *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005).) The Court finds that plaintiffs have submitted evidence from which a reasonable jury could find that defendants had such a policy, custom, or practice.

The Court notes that there is concrete evidence that defendants had a policy that required residents to be monitored in 15-minute intervals. (*See, e.g.,* ECF No. 100, PageID.3020 (citing ECF No. 100-25, PageID.3208 at 32–33 (15-minute intervals in order to observe the detainee and make sure everything is ok)); ECF No. 100, PageID.3012 (citing ECF No. 100-42, PageID.3681–3682).) However, there also is widespread evidence that it was the consistent practice of SJJS staff, to

35

not conduct the 15-minute interval checks, a practice that was known and endorsed by supervisors.

First, as Thompson testified, it was common practice for the observational sheets to be filled out at the beginning of a shift, most SJJS staff did so, supervisors knew about the practice, supervisors also signed their names and pre-filled out the sheets; she testified that supervisors were "okay with it. It . . . was like a routine," as "[i]t was the culture around the building" and/or "a comfortable habit." (ECF No. 117-20, PageID.5858–5859 at 61–64.)

Second, Howard similarly told Christopher Barr, a State of Michigan Division of Child Welfare Licensing Consultant, that it was a practice at the Calumet Center to falsify room monitoring (15-minute room check) records. (ECF No. 117-22, PageID.5896 at 15–16.) Third, there is evidence that the juvenile detainees knew that SJJS staff often did not perform the 15-minute checks. (*See, e.g.,* ECF No. 100-34, PageID.3533 at 42–44, 48.)

Fourth, there is evidence that Fernandez was aware that SJJS staff did not perform the 15-minute checks, but she did not take or order any corrective action. (*See* ECF No. 117-23, PageID.5909–5911.) Bobby

36

Newsome, who worked in security at SJJS in 2018, testified that he communicated many concerns to Fernandez. (*Id.*) Broadly speaking, the concerns Newsome expressed constitute evidence that SJJS staff was not supervising the juvenile detainees. Most acutely, Newsome testified that he gave Fernandez a written document with these concerns, including his observation that SJJS employees were not performing the required 15-minute checks. (*Id.*) Newsome testified that Fernandez did nothing about the concerns. (*Id.* at PageID.5909, 5911.)

Based on the foregoing evidence, the Court concludes that a reasonable trier of fact could find that SJJS had a policy, custom, or practice of not enforcing the 15-minute room checks that were required for juvenile detainees' safety. A reasonable trier of fact could also find that, notwithstanding multiple suicide attempts involving juvenile detainees trying to hang themselves from vents, defendants' practice or custom was to retain the dangerous vents in the rooms rather than replace them, consistent with the Mental Health Environment of Care Checklist General Criteria that Fernandez possessed. (ECF No. 117-17, PageID.5786.)

### iii. Causation

Plaintiffs also must establish a causal connection between the policy, custom, or practice and the injury. *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Defendants argue that plaintiffs cannot establish causation, specifically contending that plaintiffs merely "speculate that, had Juan been monitored in 15-minute intervals, he would not have been capable of committing suicide, and speculate that, had suicide-deterrent air vents been installed in Juan's bedroom, Juan might not have found another way to commit suicide." (ECF No. 100, PageID.3046–3047 (citing *Powell-Murphy v Revitalizing Auto Communities Environmental Response Trust*, 333 Mich. App. 234, 245, 246 (2020) ("The causation element of a negligence claim encompasses both factual cause (cause in fact) and proximate, or legal, cause" and "while factual causation may be established with circumstantial evidence," the evidence must be more than speculative.).)

Defendants rely on video evidence and the testimony of Kida and Douglas that they last interacted with Juan only five minutes before Thompson found Juan in his room. (*Id.* at PageID.3047.) For these reasons, defendants believe plaintiffs are unable to show that the failure

38

to conduct 15-minute checks was a proximate cause of Juan's death. The Court notes the testimony of Douglas and Kida as to when they interacted with Juan, but no party has submitted any video that would support or disprove their estimation of timing between when they last saw Juan and when Thompson found Juan at approximately 8:42 p.m.

The Court finds that defendants again fail to consider all of the evidence in the record in a light most favorable to plaintiffs. There is evidence that, on September 11, 2018, (a) SJJS staff adhered to the facility's practice of prefilling the observational sheets, as the supervision log for Juan's unit was filled out before it was placed outside of his room at approximately 8:00 p.m. (ECF No. 117, PageID.5290 (citing ECF No. 117-4, PageID.5559–5560 at 42–43, 48)); and (b) SJJS staff adhered to their practice of not conducting the 15-minute interval checks, as no one conducted a check on Juan between 7:56 p.m. and 8:42 p.m.. (*See, e.g.*, *id.* at PageID.5896–5897 at 14–15, 19–20; ECF No. 117-19, PageID.5818, 5822; ECF No. 117-20, PageID.5854 at 44–45.) There is also evidence that someone forged, without consent, the signature of SJJS youth supervisor Dillard, who was distributing medication that evening. (ECF No. 117-21, PageID.5881–5882 at 38–45.)

39

Defendants also fail to contemplate that, prior to Juan's death, numerous juvenile detainees had tried to hang themselves by looping the t-shirts and/or bed sheets through the vents, some of whom were cut down by Thompson. As evidenced by those attempts, defendants were on notice that the vents were dangerous. Further, defendants do not address that: (a) Fernandez possessed, in at least her email, a Mental Health Environment of Care Checklist General Criteria that stated: "vents or registers must be designed so that they cannot be used as anchor points for hanging;" or (b) the fact that they did not change the vents in Juan's room (and the other juvenile detainees) that violated that industry standard, at least as of September 11, 2018, notwithstanding all of that knowledge.

The Court also notes that plaintiffs have proffered the reports of several experts, each of whom concludes that SJJS staff's failure to conduct the 15-minute checks, a practice by SJJS staff that was admitted and evident yet not addressed, was a proximate cause of Juan's death. Three such experts, Michael M. Baden, M.D., Bennet I. Omalu, MD, and Werner U. Spitz, M.D., FCAP, have opined that it would have taken longer than 15 minutes for Juan to prepare for and carry out his death

by suicide. (*See* ECF No. 117-12, PageID.5727 ("It is my opinion, to a reasonable degree of medical certainty, based on my education, training and experience, and on the above materials that I have reviewed, that if the required 15-minute check had been made it is more likely than not that Juan's death would have been prevented"); ECF No. 117-13, PageID.5748 ("if the personnel at the Juvenile Detention Facility had checked on Juan Quintana's wellbeing on a timely schedule, there was a reasonable probability that the cascade of his suicide completion would have been interrupted and his death would have been prevented"); ECF No. 117-24, PageID.5919 ("I must point out that it would have taken a significant amount of time to climb up on the toilet, tie the sheet securely to the vent, then tie the other end of the sheet around his neck and then jump off the toilet."), 5920 ("It would seem that had the staff at the Juvenile center carried out eye-on room checks as they were supposed to do, personally checking each resident every 15 minutes or less, Juan would have been observed tying the sheet to the vent which would have stopped him from proceeding.").) Baden also stated that, in his experience investigating custodial suicide deaths, vents that can serve as anchoring points "should not be placed where detainees can reach them

to attach a ligature."[3] (ECF No. 117-12, PageID.5726.)

For those reasons, the Court concludes that, as plaintiffs have proffered sufficient evidence of a strong likelihood of imminent suicide, a jury could find that it was reasonably foreseeable that when defendants isolated Juan in his room, with the means of completing a death by suicide (i.e., with blankets and a dangerous vent by which to hang himself), but failed to provide any supervision or conducting the requisite 15-minute checks, Juan would at least attempt to hang himself.

### iv. Piercing the Corporate Veil

Defendants argue that plaintiffs cannot proceed against SHS based upon piercing the corporate veil. However, as plaintiffs note and defendants do not dispute, in the negligence action filed by the same plaintiffs against the same defendants, the state court previously rejected defendants' argument. (*See* ECF No. 117-27, PageID.5948, 5954 (quoting *Nugent v. Spectrum Juvenile Justice Services et al.*, No. 20-014709-NO, Wayne County Circuit Court, Oct. 19, 2022 Order) ("In the Court's view, Plaintiffs' evidence and deposition testimony sufficiently

---

[3] "Ligature" means "something that is used to bind." *See* https://www.merriam-webster.com/dictionary/ligature.

creates questions of material fact as to the factors considered for piercing the corporate veil in a parent-subsidiary relationship," such that a jury could hold SHS liable for Juan's death.).)

Under the Full Faith and Credit Act, a decision by a court of the State of Michigan has the same preclusive effect in this Court as that decision would have in a Michigan court. *See* 28 U.S.C. § 1738 (providing, in pertinent part, that state court "judicial proceedings shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken."); *see also Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *Chakan v. Detroit*, 998 F. Supp. 779, 783 (E.D. Mich. 1998); *In Re Air Crash at Detroit Metro. Airport*, 776 F. Supp. 316, 320 (E.D. Mich. 1991).

As defendants elected to litigate the piercing the corporate veil issue in the state court and had a full and fair opportunity to litigate the issue in the prior proceeding before the state court issued its ruling, this Court will not revisit the issue at this time. *See Chakan*, 998 F. Supp. at 783 (barring plaintiff's cause of action on both res judicata and collateral estoppel grounds when the factual basis for plaintiff's Title VII claim in

43

federal court was the same as the factual basis for his state law Elliott-Larsen Civil Rights Act claim that the state court dismissed); *Jones v. City of Saline*, No. 95-CV-73767-DT, 1995 WL 871206, at **1–2 (E.D. Mich. 1995). Accordingly, the Court holds that there is a genuine dispute of material fact as to whether plaintiffs can establish that the corporate veil should be pierced, such that SHS could be held liable for Juan's death.

### v.   Damages

Defendants seek to limit the scope of possible damages available to plaintiffs should the case go to a jury. First, defendants assert that plaintiffs cannot recover punitive damages, which are appropriate only where the "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves a reckless or callous indifference to the federally protected rights of others." *Blair v. Harris*, 993 F. Supp. 2d 721, 732 (E.D. Mich. 2014) (internal punctuation omitted) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

The Court is not persuaded by defendants' contention that there is no evidence from which a jury could find that defendants "willfully, intentionally, recklessly, or callously violated Juan's constitutional

rights." (ECF No. 100, PageID.2997.) For example, if the jury believes that Thompson screamed, "He fucking told me!" because Juan or another juvenile detainee had told her (and Howard) earlier that day that Juan was threatening suicide, the jury could find that Thompson (and defendants) recklessly and/or callously violated Juan's rights by not taking any action, especially when Thompson and others failed to conduct the required 15-minute checks on Juan—checks that are designed to ensure the detainee's welfare and safety.

Defendants next seek to preclude any damages pursuant to the Michigan Wrongful Death Act ("WDA") for the conscious pain and suffering caused by defendants that Juan endured between the time of his injury and his death. Defendants argue that, to the extent that Juan suffered any loss of enjoyment, it was only after his death, which is not compensable. (ECF No. 100, PageID.3053–3054 (citing *Brereton v. United States*, 973 F. Supp. 752, 754 (E.D. Mich. 1997); *Kemp v. Pfizer*, 947 F. Supp. 1139, 1146 (E.D. Mich. 1996).) Defendants have not submitted any evidence that Juan did not suffer conscious pain and suffering between the time of his injury and his death. Plaintiffs, however, have submitted the opinion of Dr. Baden that Juan "did

45

experience at least ten seconds of physical pain and many minutes of mental suffering before he lost consciousness." (ECF No. 117-12, PageID.5727.) The Court therefore finds that it is a question of fact for the jury whether plaintiffs can recover for any pain and suffering experienced by Juan between the time of his injury and his death.

Finally, defendants contend that a recent Michigan Supreme Court decision bars a recovery of damages for lost future financial support under the WDA, including any claim for loss of future earning capacity and loss of future household services. (ECF No. 100, PageID.3054 (citing *Daher v. Prime Healthcare Servs.-Garden City, LLC*, No. 165377, 2024 WL 3587935, at *14 (Mich. July 30, 2024), *reh'g denied*, 10 N.W.3d 843 (Mich. 2024).)

The Court agrees that the Michigan Supreme Court clearly and unequivocally held that loss of earning capacity damages are not available. *Daher*, 2024 WL 3587935, at *14 ("lost-earning-capacity damages are not available under the WDA"). The *Daher* court did not, however, rule that a claim for loss of future household services is barred. Contrarily, the *Daher* court implicitly recognized otherwise when stating that a husband could be compensated for loss of his wife's services. *Id.* at

46

*7 (citations omitted) ("In the *Olney Case⁴* [sic] we recognized that, beyond compensation to a husband for loss of his wife's services, the right to recover for pecuniary loss must be predicated upon the existence of some next of kin having a legally enforceable claim to support or maintenance by [the] deceased."). Further, the Michigan Court of Appeals recently held that a plaintiff is entitled to recover loss-of-services damages. *See Demott v. VHS Harper-Hutzel Hosp., Inc.*, No. 369500, 2025 WL 2004671, at *13 (Mich. Ct. App. July 17, 2025) ("We hold, however, that following *Daher*, loss-of-services damages remain available under the WDA."). Therefore, the Court holds that plaintiffs may not pursue loss of future earning capacity damages, but plaintiffs may pursue damages for loss of future household services.

### c.    Conclusion

For the reasons stated above, the Court **DENIES** defendants' motion for summary judgment as it pertains to potential liability of SJJS and SHS.[5] As to damages, the Court **GRANTS** defendants' motion for

---

[4] *In re Olney's Est.*, 14 N.W.2d 574, 582 (1944).

[5] *Loyer* was decided after the parties briefed the motion for summary judgment, and the Court granted defendants' ex parte motion for leave to file *Loyer* as supplemental authority. (*See* ECF No. 132; 07/07/2025 Text Only Order; ECF No. 148). Defendants assert that in *Loyer*, "[t]he decedent's estate made strikingly similar claims to the

summary judgment to preclude loss of future earning capacity damages, but the Court **DENIES** defendants' motion for summary judgment to preclude damages for loss of future household services.

### C.   Motions for Leave to File Supplements

The Court has reviewed and considered defendants' motion for leave to file supplement to motion for summary judgment (ECF No. 127) and plaintiffs' ex parte motion for leave to file supplemental authority. (ECF No. 133.) For the reasons set forth in the respective motions, and in the interest of a complete record, the Court **GRANTS** both motions and has considered the motions and briefs when deciding defendants' motion for summary judgment.

---

Plaintiffs in this case, including that the defendant's deliberate indifference was exemplified by a failure to perform mandatory eye-on checks, by a failure to repair surveillance equipment, and by a failure to adequately train employees." (ECF No. 132, PageID.6587.) However, the Court does not find *Loyer* helpful in deciding any issue in this case. Other than a custodial death by suicide, the facts are not analogous to the facts of this case for many reasons, including, without limitation: (1) contrary to defendants' arguments, the only mention of any "eye-on checks" in *Loyer* was when the court noted that plaintiff alleged that corrections officers failed to conduct required 30-minute checks the night decedent died by suicide and there was no suggestion that the municipality had a policy, practice, or custom of not conducting the 30-minute checks, *Loyer*, 2025 WL 889770, at *2; (2) there was no evidence that that decedent made any suicidal statements, had previously harmed himself while in custody, or had previously attempted suicide, in jail or elsewhere, *id.* at **5, 6; and (3) there was no evidence that "any officer knew of a strong likelihood that Loyer would commit suicide," *id*; (4)

### D.    Motion to Quash

Defendants claim that, on August 14, 2025, over 13 months after
the close of fact discovery, plaintiffs mailed a subpoena to Financial One
Accounting ("Financial One"), which is not a party to this case. (*See* ECF
No. 135-2.) The subpoena sought to have Financial One produce financial
documents relating to SJJS and SHS from 2015 to 2018, on or before
August 29, 2025. (*Id.*) Defendants state that SHS and SJJS outsource
their accounting services to Financial One, and plaintiffs were aware of
Financial One's role in SHS's and SJJS's accounting practices since 2021,
yet did not request any documents or subpoena related to Financial One
while discovery was open.

Defendants argue that plaintiffs' subpoena of Financial One should
be quashed as untimely and because it seeks irrelevant and privileged
information.[6] Plaintiffs did not file a response to the motion to quash

---

[6] To have standing to quash or object to a Rule 45 subpoena of a non-party, a party
must typically establish a claim of privilege or personal right to the requested
documents. *See, e.g., Boodram v. Coomes*, No. 1:12CV-00057-JHM, 2016 WL
11333789, at *2 (W.D. Ky. Jan. 28, 2016) (citations omitted). The Court concludes
that, although the subpoena is to a non-party witness, defendants have standing
because Financial One is defendants' accounting firm. *See, e.g., Fusion Elite All Stars
v. Varsity Brands, LLC*, 340 F.R.D. 255, 260–261 (W.D. Tenn. 2022) (quotations and
internal citations omitted) ("For example, a party has a personal interest in . . .
banking records of a party that are in the possession of a financial institution ..."); *see
also Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 206 F.R.D. 78, 93 (S.D.N.Y. 2002)
(standing to oppose discovery of personal bank records).

subpoena. The Court agrees that the subpoena is untimely as it was filed over a year after discovery closed. Plaintiffs have not supplied a reason for the subpoena's untimeliness or why the subpoena should not be quashed. The Court therefore **GRANTS** the motion to quash plaintiffs' subpoena to Financial One.

Defendants also contend that they are entitled to the costs and attorney fees associated with filing the motion to quash Plaintiffs' subpoena. Defendants sought concurrence from plaintiffs' counsel in the motion to quash, thereby complying with Eastern District of Michigan Local Rule 7.1, on August 15, 2025. (*See* ECF No. 135, PageID.6752; ECF No. 135-4, PageID.6787.) When defendants filed the motion to quash two weeks later (on August 28, 2025), plaintiffs' counsel still had not responded.

The Court finds that the subpoena was invalid from its issuance, which imposed undue burden and expense on defendants and Financial One to address it, including filing the motion to quash. Pursuant to Federal Rule of Civil Procedure 45(d)(1),

> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. **<u>The court for the district where compliance is required</u>**

**must enforce this duty and impose an appropriate
sanction**—which may include lost earnings and reasonable
attorney's fees—on a party or attorney who fails to comply.

*Id.* (emphasis added).

Accordingly, pursuant to Rule 45(d)(1), the Court must sanction plaintiffs' counsel for improperly and unjustifiably issuing the third-party subpoena to Financial One and failing to respond to defendants' counsel's attempt to obtain concurrence, thus requiring defendants to incur the expense of filing the motion to quash, even though plaintiffs never opposed that motion. The Court finds that defendants should be reimbursed for the reasonable costs associated with filing the motion to quash. Therefore, the Court **ORDERS** that plaintiffs shall pay defendants $2,000 as sanctions for plaintiffs' improper and unwarranted third-party subpoena, particularly as defendants had to file a motion to quash due to plaintiffs' failure to respond to defendants' request for concurrence on a motion with which plaintiffs apparently agreed.

### E.    Motion to Compel Deposition of Stephanie Hayes

On September 12, 2024, after discovery had closed, Magistrate Judge Curtis Ivy ordered that defendants produce Stephanie Hayes for a deposition at the earliest possible date. Her deposition was scheduled for

October 18, 2024 at 2:00 p.m. Hayes' colleague, Tiara Fullilove, was scheduled for a deposition on October 18, 2024, at 1:00 p.m. immediately before Hayes. Fullilove's deposition began at 1:02 p.m. and ended before it was completed at 2:17 p.m. During Fullilove's deposition, defendants' counsel noted that he had to be done with the deposition by 3:15 p.m. and repeatedly stated that, because the deposition of Hayes could not be completed on October 18, 2024, they "will produce Ms. Hayes at a different date." (*See, e.g.,* ECF No. 138-4, PageID.7407.)

Hayes was called to commence her deposition on October 18, 2024 at some time after 2:17 p.m. and before 2:53 p.m. Although present at the time and place directed on the subpoena, Hayes refused to participate in the deposition when called, possibly on advice of defendants' counsel (who she called before beginning the deposition), and she left before subjecting herself to the scheduled deposition. Plaintiffs' counsel promptly made a record regarding Hayes' actions, concluding that, "We will be proceeding with the motion to compel and requesting further sanctions to be levied against Mr. Mark Zausmer and/or his firm for failing to comply with this Court's order as well as the lawfully notice of Ms. Stephanie Hayes' deposition marked here in Exhibit 1." (ECF No. 138-3, PageID.7348.)

Based on the parties' briefing of the motion to compel, it is undisputed that: (1) defendants' did not attempt to reschedule Hayes' deposition; (2) plaintiffs' counsel did not attempt to reschedule Hayes' deposition until August 19, 2025; (3) plaintiffs' counsel did not speak with defendants' counsel until August 22, 2025; and (4) during that call, defendants refused to reproduce Hayes because discovery closed a long time ago. Plaintiffs filed the motion to compel on August 29, 2025.

The Court **DENIES** the motion to compel. The Court does not condone the actions of defendants' counsel or Hayes in failing to sit for the deposition on October 18, 2024. However, based on: (a) the parties' briefs; (b) the two-hour, forty-minute deposition of Jeremy Nelson on October 18, 2024; (c) the one-hour, fifteen-minute partial deposition of Fullilove on October 18, 2024; (d) the fact that both Nelson and Fullilove stated that Hayes was the person who was responsible for the investigation at issue that the three of them conducted, Hayes' deposition likely would not have been completed on October 18, 2024. In other words, a second date to continue Hayes' deposition would have been necessary, even if her deposition had started on October 18, 2024.

More significantly, plaintiffs' counsel's failure to make any attempt

to depose Hayes over the ensuing 10 months is unjustifiable. At any reasonable time after October 18, 2024, plaintiffs' counsel could have reached out to defendants' counsel to try to agree on a new date to depose Hayes. If no such agreement could have been reached, plaintiffs' counsel could have and should have timely filed the motion to compel that he indicated that he would file when he made a record about Hayes' absence on October 18, 2024. Since plaintiffs failed to take any action to depose Hayes between October 18, 2024 and August 19, 2025, the Court finds that plaintiffs waived their right to conduct the deposition of Hayes.

## V.   CONCLUSION

For the reasons stated above, **IT IS ORDERED** that defendants' motion for summary judgment (ECF No. 100) is **DENIED IN PART** and **GRANTED IN PART**.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment is **DENIED** as to: (1) the potential liability of SJJS and SHS; and (2) defendants' request to preclude damages for loss of future household services.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment is **GRANTED** as to defendants' request to preclude

loss of future earning capacity damages

**IT IS FURTHER ORDERED** that defendants' motion to strike affidavits of Daniel Johnson and Xyler Wiseman (ECF No. 118) is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motion for leave to file supplement to motion for summary judgment (ECF No. 127) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' ex parte motion for leave to file supplemental authority (ECF No. 133) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants' motion to quash plaintiffs' invalid subpoena to Financial One and request for sanctions (ECF No. 135) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion to compel the deposition of Stephanie Hayes (ECF No. 136) is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motion requesting status conference (ECF No. 140) is **DENIED AS MOOT**, as the Court held a status conference on November 12, 2025.

**IT IS FURTHER ORDERED** that, to the extent defendants wish to depose Johnson and/or Wiseman, defendants **SHALL**, on or before

November 21, 2025, notice Johnson and/or Wiseman for depositions to be conducted on or before December 12, 2025.

**IT IS FURTHER ORDERED** that plaintiffs' counsel shall pay defendants $4,000 as sanctions for untimely identifying Daniel Johnson and Xyler Wiseman as witnesses ($2,000) and unnecessarily making defendants' file a motion to quash the non-party subpoena to Financial One ($2,000).

**SO ORDERED**.

<u>**s/Jonathan J.C. Grey**</u>
JONATHAN J.C. GREY
Dated: November 14, 2025          UNITED STATES DISTRICT JUDGE

## Certificate of Service

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 14, 2025.

<u>**s/ S. Osorio**</u>
Sandra Osorio
Case Manager